# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Marvin Lumber and Cedar Company, *et al.*,

                    Plaintiffs,                    Civ. No. 10-3881 (RHK/LIB)
                                                   **MEMORANDUM OPINION**
v.

Sapa Extrusions, Inc.,

                    Defendant.

Sapa Extrusions, Inc.,

                    Third-Party Plaintiff,

v.

The Valspar Corporation,

                    Third-Party Defendant.

Justice Ericson Lindell, Robert R. Weinstine, Joseph M. Windler, Derek R. Allen, Winthrop & Weinstine, PA, Minneapolis, Minnesota, for Plaintiffs.

Andrew K. Fletcher, Evan A. Bloch, Richard M. Weibley, Pepper Hamilton LLP, Pittsburgh, Pennsylvania, John W. Ursu, Robert J. Gilbertson, Sybil L. Dunlop, Greene Espel PLLP, Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

Plaintiff Marvin Lumber and Cedar Company ("Marvin")[1] manufactures windows,

doors, and related products. For more than ten years it purchased painted aluminum

---

[1] There are two named Plaintiffs in this case—Marvin Lumber and Cedar Company and Marvin Windows of Tennessee, Inc.—but the parties refer to them as "Marvin" and treat them as a single entity, and the Court will do the same.

extrusions[2] (referred to as "lineals") from Defendant Sapa Extrusions, Inc. ("Sapa"),[3] which it used to make aluminum-clad windows and doors. Customers who installed these products in coastal locations eventually began to complain that the products were losing paint adhesion, and Marvin undertook extensive (and expensive) repairs. It commenced this action against Sapa in 2010, seeking to recoup its repair costs; it asserted breach of contract, breach of express and implied warranties, fraud, and similar claims. Sapa later asserted third-party claims against Valspar Corporation ("Valspar"), its paint supplier, for contribution and indemnity.

The parties undertook extensive discovery lasting more than two years and, with that discovery complete, each moved for summary judgment in whole or in part. The Motions were fully and thoroughly briefed, and the Court heard oral argument on July 18, 2013. Mindful of the parties' preparations for the quickly approaching trial date, the Court issued a short Order (Doc. No. 474) on July 22, 2013, disposing of Marvin's, Sapa's, and Valspar's Motions. In that Order, the Court granted Marvin's and Sapa's Motions in part and denied each in part; the Court now issues this Memorandum Opinion setting forth the reasons for those decisions.

---

[2] An "extrusion" is a piece of material (such as aluminum) that has been pushed through a die in order to form it into a particular shape.

[3] Sapa was previously known as Alcoa Extrusions, Inc. and Alumax, Inc. For simplicity, the Court refers to all of these entities as "Sapa," and it has replaced the terms "Alcoa" and "Alumax" with "Sapa" when referencing evidence in the record.

## BACKGROUND

The background in this case has been thoroughly discussed in several prior Orders issued by Magistrate Judge Brisbois and need not be repeated here.[4] Facts are recited below only as necessary to understand the Court's decisions on the currently pending Motions and, where recited, are taken in the light most favorable to the non-moving party.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The moving party bears the burden of showing that the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529–30 (2006); Weitz Co. v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

---

[4] For a full discussion of the facts leading up to the instant case and a history of the litigation, see Document Numbers 63, 97, 107, 164, 206, 223, and 314.

**ANALYSIS**

## I.    Marvin's Motion for Partial Summary Judgment

Marvin moves for summary judgment on three issues. It asks the Court to conclude as a matter of law that (1) Sapa provided Marvin an express ten-year warranty guaranteeing the performance of its lineals (referred to as the "Performance Warranty"); (2) the Terms and Conditions ("T&Cs") Sapa attached to the parties' Firm Metal Contracts ("FMCs") do not apply to the sales of lineals; and (3) in the event the T&Cs do apply, certain provisions are unenforceable.

### A.    Did Sapa Provide a Performance Warranty?

Marvin alleges Sapa provided it two express warranties and breached both. Sapa acknowledges giving Marvin one of the express warranties but denies giving the other. Sapa agrees that it provided a warranty guaranteeing its lineals would meet Marvin's specifications upon shipment (referred to as the "Warranty of Description"). But it denies providing Marvin the Performance Warranty guaranteeing that the paint on its lineals "would not crack, check, peel, or otherwise lose adhesion because of processing deficiencies for ten years after field installation." (Marvin Mem. (Doc. No. 415) at 17). Sapa contends that any such warranty Marvin received came from *Valspar*, not *Sapa*. (Sapa Mem. (Doc. No. 446) at 13–21.) The record reveals factual disputes on the question of the Performance Warranty that preclude summary judgment.

Marvin points to evidence in the record suggesting that Sapa warranted the performance of the lineals separate and apart from Valspar's warranty, based not on the paint itself but rather Sapa's *application* of the paint. It notes, for example, that Bob

Nolan, the erstwhile head of Sapa's Yankton, South Dakota factory (where the lineals were manufactured), testified in his deposition that "Valspar was standing behind the paint and [Sapa] was standing behind the application." (Nolan Dep. at 26.) He further testified that Sapa provided a "warranty on the paint *system*," and "the final product out the door [came under this] warranty." (Id. at 57 (emphasis added); accord, e.g., Nolan Decl. (Doc. No. 424) ¶ 3 (noting the existence of a "ten-year performance warranty from" Sapa).) Other witnesses testified consistently. Gerald Krahn, Marvin's former Director of Purchasing who negotiated the warranty with Nolan, testified that Valspar provided a *similar*, but entirely *separate*, warranty from Sapa. (See, e.g., Krahn Dep. at 55, 81 ("[W]e didn't have a pass-through warranty, we had a warranty from [Sapa].").) And Gary Daniels, Marvin's designated corporate representative, testified that the Valspar warranty "was not Sapa's warranty to Marvin." (Daniels Dep. at 19–20.)

But the record also contains evidence to the contrary. In particular, Tim Fox, Sapa's Regional Sales Manager overseeing the Marvin account, expressly denies that Sapa ever provided Marvin with a Performance Warranty. (See Fox Aff. (Doc. No. 448) ¶ 13 ("Sapa did not provide Marvin with a performance warranty."); Fox Aff. (Doc. No. 427) ¶¶ 85–90.).) Documents in the record, too, suggest that the only warranty Marvin received was a pass-through warranty from Valspar. For example, Marvin, Sapa, and Valspar held a "corrosion summit" in late 2000, for which Marvin prepared a PowerPoint presentation. One slide in that presentation described the "Sapa Warranty" as a "[p]ass through warranty from Valspar." (Fox Aff. (Doc. No. 427) Ex. 13.) That document further confirmed "Marvin's *understanding* of the warranty" was that it was "a pass

through warranty from Valspar." (Id. (emphasis added).) In addition, a 2007 e-mail authored by Mike Codega, Marvin's Vice President of Operations, summarized the warranty as "an agreement which passed through Sapa between Valspar and Marvin." (Fletcher Aff. (Doc. No. 447) Ex. 9.) Finally, Sapa points out that the terms of the (alleged) Performance Warranty so closely track those of Valspar's written warranty that they imply Valspar's warranty was, in fact, the *only* warranty Marvin received.

Generally speaking, "[i]t is a question of fact whether an express warranty arises from the language and circumstances of a transaction." Minn. Forest Prods., Inc. v. Ligna Mach., Inc., 17 F. Supp. 2d 892, 917 (D. Minn. 1998) (Kyle, J.); accord, e.g., Hydra-Mac, Inc. v. Onan Corp., 430 N.W.2d 846, 851 (Minn. Ct. App. 1988). Here, there are thumbs pressing on both sides of the evidentiary scale. A jury ultimately will have to determine whether Sapa provided Marvin with its own Performance Warranty or only Valspar's warranty.

### B. Do Sapa's Terms and Conditions Apply?

Marvin next seeks summary judgment determining, as a matter of law, that the T&Cs Sapa attached to certain FMCs cannot apply to the sale of lineals. Once again, the Court finds factual issues preclude summary judgment on this issue.

Over the course of their relationship, Marvin and Sapa entered into FMCs for certain designated periods of time. Through these contracts, Marvin would commit to ordering a certain amount of "raw" aluminum from Sapa over a specified period of time at a fixed price. The purpose of these agreements was to "lock up" or "hedge" the price of aluminum for the designated period (sometimes a year, other times as short as one

month), protecting Marvin from market fluctuations in the price of aluminum. When Marvin purchased lineals from Sapa, one component of the purchase price was the cost of the aluminum used to make them. That price was set by an FMC, if one was in place at the time of purchase.[5]

It appears from the record that beginning in 1996, Sapa appended "standard" T&Cs to the parties' FMCs. (See, e.g., Fox Aff. (Doc. No. 427) ¶¶ 16-17 & Ex. 1.) The T&Cs contained two terms critical to the instant dispute. First, they purported to disclaim any express or implied warranties from Sapa to Marvin, except for the Warranty of Description discussed above. Second, they provided that Sapa's liability, and Marvin's "exclusive" remedy, was limited to the purchase price paid by Marvin for the lineals, and in no event would Sapa be liable for consequential damages. If applicable, therefore, the T&Cs could provide Sapa with defenses to many of Marvin's claims.

Marvin contends that the FMCs, to which the T&Cs were attached, were "entirely separate" from its purchases of painted lineals, which were transacted through purchase orders and invoices exchanged between the parties. (Marvin Mem. (Doc. No. 415) at 11.) Because the T&Cs were not attached to *those* documents, and because the FMCs were intended only to "hedge the price of raw aluminum" and Marvin "did not purchase anything" under those agreements, it argues that the T&Cs apply (at most) only to the purchase of "raw aluminum." (Id. at 9–11.) Hence, it seeks summary judgment

---

[5] Although Marvin and Sapa "typically" had an FMC in place, that was not always the case. The "raw aluminum" price charged by Sapa during those periods generally was the average price charged in the previous month. (Norling Decl. (Doc. No. 422) ¶ 7.)

determining that the T&Cs "do not apply to finished products"—that is, the lineals—it purchased from Sapa.

This argument is not without support in the record. For instance, Frank Norling, the Marvin "purchasing agent" responsible for "hedging" the price of aluminum, states that Marvin and Sapa attempted to negotiate a "formal supply agreement" in 2006, to no avail. (Norling Decl. (Doc. No. 422) ¶ 19.) "As part of the negotiations, *Sapa tried to convince Marvin to accept the Terms and Conditions as being applicable to . . . Marvin's purchase of painted lineals*." (Id. (emphasis added).) Yet, if the T&Cs were *already* applicable to those purchases, there would have been no reason for Sapa to seek Marvin's agreement in 2006. Furthermore, Marvin asserts that, despite years of discussions concerning the paint problems at issue in this case and extensive negotiations between the parties to resolve them, Sapa never held up the T&Cs as limiting or otherwise impacting its potential liability to Marvin. This "course of performance," argues Marvin, belies Sapa's contention that the T&Cs became part of the purchase of finished lineals.

But the terms of the FMCs themselves undermine Marvin's argument. For instance, nearly all refer to the purchase of "finished product" from Sapa. (Fox Aff. (Doc. No. 427) Exs. 19–49.) On their faces, therefore, the FMCs appear to contemplate the purchase of something beyond simply "raw aluminum." Furthermore, portions of the T&Cs would be stripped of any obvious meaning if applied only to "raw aluminum." By way of example, the T&Cs contain a clause providing that Marvin "will release, hold harmless, indemnify and defend [Sapa] from any liability . . . arising out of or relating to the *design of goods* supplied hereunder . . . if such goods . . . are made in compliance

with [Marvin's] *design or specifications*." (Id. Ex. 2 (emphases added).) The terms "design" and "specifications" have no apparent application to raw aluminum, and Marvin has not proffered any explanation of how those terms would apply in this context.

Nor does Marvin's argument make sense in light of the parties' relationship. The record is abundantly clear that the reason Marvin and Sapa were transacting business was because Marvin wanted to buy painted aluminum lineals from Sapa. There is absolutely no evidence to suggest that Marvin ever purchased—or intended to purchase—"raw" aluminum from Sapa. The only plausible reason for hedging the price of aluminum was to prevent increased costs for later orders of lineals, which were made from the "raw" aluminum. (See Norling Decl. (Doc. No. 422) ¶ 3 ("The FMCs were a benefit to Marvin because we were able to 'lock in' favorable pricing on raw aluminum. The price of aluminum was meaningful to Marvin *because it was one of many components that made up the price of the finished pretreated and painted aluminum lineals that Marvin purchased from Sapa.*") (emphasis added); Marvin Mem. (Doc. No. 415) at 9 ("The purpose [of the FMCs] was to allow Marvin to hedge the price of raw metal *to be used in Finished Products* it might later purchase from Sapa.") (emphasis added).) So even if Marvin did not actually *commit* to any specific purchases under the FMCs, when it later issued purchase orders to Sapa, the price of the aluminum in those orders was set by the FMCs.

In summary, therefore, the record does not ineluctably lead to the conclusion that the T&Cs apply—or do not apply—to Marvin's finished lineal purchases from Sapa.

Accordingly, the Court cannot determine that Marvin is entitled to judgment as a matter of law on this issue—this matter will be left for a jury to resolve.

## C.    Are the Terms and Conditions Enforceable?

Marvin has argued, in the alternative, that even if the T&Cs apply to its purchases of lineals from Sapa, two key provisions therein are unenforceable under the Uniform Commercial Code ("U.C.C.").[6]  The Court agrees.

### i.    *Disclaimer of Warranties*

Marvin first argues that Sapa "gave the Performance Warranty . . . in 1991, confirmed . . . the warranty . . . in 2001, and reaffirmed its warranty obligations in 2006 and 2007."  (Marvin Mem. (Doc. No. 415) at 24.)  Accordingly, it contends that the warranty disclaimer in the T&Cs (which were first used in 1996, five years after Sapa allegedly gave the warranty) must be ineffective because, under the U.C.C., the "*negation or limitation* [of an express warranty] is inoperative" to the extent it cannot be reconciled with the *creation* of the warranty.  U.C.C. § 2-316 (emphasis added).[7]  In response, Sapa continues to dispute that it gave Marvin a Performance Warranty.  But it also argues that even if it gave such a warranty in 1991, nothing precluded it from *later* disclaiming that warranty for *future* purchases.  (Sapa Mem. (Doc. No. 446) at 27 ("[E]ven if Sapa had provided an oral performance warranty in 1991, there is no prohibition against [it] later

---

[6] The T&Cs contain a Pennsylvania choice-of-law clause, but there is no material difference between Pennsylvania and Minnesota law on this issue because each state has adopted the U.C.C..  Compare Minn. Stat. § 336 with 13 Pa. Cons. Stat. § 336.

[7] This argument concerns only the (alleged) Performance Warranty.  There is no dispute that Sapa's Warranty of Description was not disclaimed.

advising Marvin, for *subsequent sales*, that it provides Marvin with *no performance warranty*.").)

While there is some superficial appeal to this argument, Marvin correctly notes that the undersigned implicitly rejected it in <u>Minnesota Forest Products</u>, 17 F. Supp. 2d at 917. There, the defendant made oral representations to the plaintiff about the performance of its milling products. <u>Id.</u> at 899–900. The plaintiff later agreed to purchase the products and, at that time, the defendant provided a written disclaimer indicating that it offered no warranty other than for defects in workmanship—in other words, the defendant purported to disclaim its earlier oral representations, much like Sapa here. <u>See id.</u> at 901. The undersigned held the warranty and disclaimer could not be reconciled and the disclaimer was therefore invalid because "[i]f a defendant's express warranty and its disclaimer cannot be reasonably reconciled with one another . . ., the language of the express warranty must prevail." <u>Id.</u> at 917 (citing <u>Wenner v. Gulf Oil Corp.</u>, 264 N.W.2d 374, 384 (Minn. 1978)). Importantly, it made no difference in that case that the warranty was (purportedly) disclaimed after the oral representation but before the actual sale—the disclaimer was still ineffective. The Court perceives no reason to conclude otherwise here. <u>See also Hydra-Mac</u>, 430 N.W.2d at 851–52 (rejecting attempted warranty disclaimer coming *after* oral representations about quality, durability, and reliability of defendant's products, but *before* plaintiff actually purchased the product); <u>Zutz v. Case Corp.</u>, Civ. No. 02-1776, 2006 WL 463539, at *4 (D. Minn. Feb. 24, 2006) (Magnuson, J.) (invalidating attempted disclaimer of prior oral warranty).

*ii.    Limitation of Remedies and Damages*

As noted above, the T&Cs contain provisions purporting to preclude the recovery of consequential damages and capping Marvin's damages at the price it paid for the lineals.  Marvin seeks to cast aside those provisions (assuming the T&Cs are applicable at all) with several different, but closely related, arguments.  The Court concludes that these provisions cannot be enforced under the facts presented here.

The U.C.C. permits parties to limit remedies and damages by way of contract, but those limitations will be invalid if (i) "an exclusive or limited remedy . . . fail[s] of its essential purpose" or (ii) "the limitation or exclusion is unconscionable."  U.C.C. § 2-719(2)–(3).[8]  "[I]t is of the very essence of a sales contract that at least minimum adequate remedies be available."  § 2-719, cmt. 1.  Here, Marvin contends that a cap on damages equal to the lineals' purchase price "is essentially meaningless given that Marvin's damages far exceed this amount."  (Marvin Mem. (Doc. No. 415) at 29.)  It notes that Sapa has always been aware the lineals would be incorporated into windows later installed in houses, and the total cost to remove, repair, and replace those windows is dramatically higher than the lineals' total purchase price.  Therefore, according to Marvin, limiting damages to the purchase price would essentially amount to no remedy at all and fails of its essential purpose.  It cites a number of cases invalidating damages limitations for such reasons.

---

[8] Some courts have addressed this issue by asking whether a "fair quantum of remedy" exists, a phrase found in the U.C.C.'s comments to Section 2-719.  In the Court's view, this is merely a semantic difference.

Sapa responds that both it and Marvin are large, sophisticated parties with equal bargaining power, able to contract to protect themselves as they see fit. (Sapa Mem. (Doc. No. 446) at 36–39.) It contends that the huge costs in repairing "defective" lineals after they have been incorporated into windows and installed in homes is "exactly why sellers" such as Sapa "insist on limitation of remedy provisions in their" contracts. (Id. at 36.) It points to several cases enforcing such limitations.

The Court recognizes some appeal to each party's position, but ultimately Marvin has the better argument. To reach that conclusion, the Court need only look to an earlier lawsuit involving Marvin with facts eerily similar to this case: Marvin Lumber & Cedar Co. v. PPG Industries, Inc., 401 F.3d 901 (8th Cir. 2005). There, Marvin purchased wood preservative from PPG, which it used to treat windows during manufacturing, in order to prevent them from rotting. PPG employees represented that "wood products treated with [its preservative] would last as long or longer than" a different preservative Marvin had used previously, and Marvin agreed to purchase PPG's preservative based on those representations. Id. at 905. It later submitted purchase orders to PPG, in turn receiving "order acknowledgements" containing a clause purporting to limit damages to the purchase price of the preservative—far less than it actually cost to repair the windows, which eventually rotted because the preservative was defective. Id. at 909–10. Following a four-month trial, a jury determined that the representations made by PPG employees constituted an express warranty, which PPG had breached. Id. at 906. It awarded Marvin more than $150 million in damages after the District Court refused to enforce the damages limitation contained in the order acknowledgements. Id.

On appeal, one issue raised by PPG was whether the damages limitation should have been enforced. Resolution of that issue turned on whether the order acknowledgements (which contained the limitation) materially altered the parties' deal and, accordingly, did not become part of their bargain. This required the Eighth Circuit to analyze whether the limitation "result[ed] in surprise or hardship" to Marvin. Id. at 910–11 (quoting U.C.C. § 2-207, cmt. 4). Although distinct from the question before this Court, the Eighth Circuit's reasoning is nonetheless pertinent:

> Economically, the hardship to Marvin is clear—the $1.6 million PPG says it owes under the terms of the acknowledgment is a fraction of the out-of-pocket costs to Marvin resulting from [the preservative's] failure, not even considering any consequential damages. Under the terms of the [damages] limitation, the distribution between Marvin and PPG of risk of the product's failure is dramatically altered, with Marvin bearing the brunt of it. The warranty that the jury found was for future performance. The failure of the product in the future—after it was applied to the wood and the wood was made into a window and installed in a building—would be, and was, catastrophic in terms of damages. *Given that the warranty was for [the preservative's] future performance, the damages should remedy a failure of that future performance, not just refund the money spent for the product. Reimbursing the cost of the product—essentially "replacing" the product—would not enforce the warranty that PPG gave to Marvin.* Moreover, most of the damages at issue were unquestionably foreseeable.

Id. at 912 (emphasis added). The Court conceives of no reason to apply different logic in this case.[9]

Here, as in PPG, a large, sophisticated entity gave Marvin an (alleged) oral express warranty regarding a product's future performance. Here, as there, the seller attempted to limit Marvin's remedies to the price paid for the product. Here, as there, the purchase

---

[9] Indeed, while the Eighth Circuit made clear in PPG that it was *not* deciding "whether the damages limitation clause . . . fails of its essential purpose or is unconscionable," id. at 910 n.4, it nevertheless recognized "the similarity of what [it said] to an application of the 'fails of its essential purpose' test," id. at 912 n.7.

price amounted to only a small fraction of the overall repair cost when the product failed, which cost was foreseeable to the seller.  Under these circumstances, because the (alleged) warranty was for the lineals' future performance, the damages recoverable by Marvin must "remedy a failure of that future performance" and "not just refund the money spent for the product."  Id.  The damages limitation cannot stand.

For these reasons, the Court concludes that the T&Cs cannot save the day for Sapa.  Assuming for the sake of argument that a jury concludes Sapa gave Marvin the Performance Warranty on the lineals, and further assuming the jury finds the T&Cs became part of the parties' bargain, the T&Cs' attempted disclaimer of the Performance Warranty is invalid under U.C.C. § 2-316 and the damages limitation is invalid under U.C.C. § 2-719.   Therefore, a jury's finding on the issue of the Performance Warranty will be dispositive—*if* the warranty is found to have been given, it will be enforceable.

## II.     Sapa's Motion for Partial Summary Judgment

In its Complaint, Marvin asserted claims against Sapa for breach of contract, breach of express warranties, breach of implied warranties, negligent misrepresentation, fraud, fraudulent concealment, statutory violations, contribution, and indemnity.  Sapa moves for summary judgment on all of Marvin's claims except one—the claim that Sapa breached its Warranty of Description.

### A.     Breach of Contract

Marvin's original breach-of-contract claim encompassed two categories of allegedly defective lineals:  (1) those which had already been incorporated into Marvin's products and corroded, and (2) those which Marvin asserts it rejected after failed quality

testing and have not been used.  The parties agree that Marvin's claim for damages stemming from the former category of lineals is properly considered as a breach of warranty, not a breach of contract.  But Marvin maintains its breach-of-contract claim regarding the latter category of lineals it allegedly rejected.

Marvin contends that it began testing the quality of randomly selected Sapa lineals in late 2007 and, based on the poor results, decided to "quarantine all of the metal in the lots from which failed materials came."  (Norling Decl. (Doc. No. 457) ¶ 7.)  Marvin continued this process of testing and "quarantining" lineals and sent Sapa various communications requesting Sapa collect the lineals and credit Marvin's account.  Marvin asserts this conduct operated as a rejection of the goods, while Sapa maintains that Marvin accepted the goods.  But, Sapa argues, even if Marvin had tried to revoke its acceptance, such revocation would be barred by Sapa's T&Cs, which require Marvin to accept or reject goods within 90 days of delivery.  Neither of Sapa's arguments is persuasive.

Under the U.C.C., a buyer may revoke its acceptance of nonconforming goods under certain circumstances and such revocation will operate as a rejection of the goods, provided the revocation occurs within a "reasonable time after the buyer discovers" the nonconformity.  U.C.C. § 2-208.  Although Sapa contends there is "no evidence that Marvin later attempted to revoke its acceptance of these goods," the record demonstrates otherwise.  (Sapa Mem. (Doc. No. 420) at 11.)  Marvin has submitted evidence showing that Sapa's goods failed Marvin's quality testing and that Marvin notified Sapa of this fact after receiving the testing results and demanded Sapa credit its account.  The record

includes several statements, letters, and emails supporting Marvin's contention that it revoked its acceptance of the goods.  (See Norling Decl. (Doc. No. 457) ¶¶ 7–11 & Exs. 1–3.)

As to Sapa's second argument, there is no dispute that Marvin did not revoke its acceptance within 90 days of delivery, considering the testing took at least 166 days. There is, however, a genuine issue of material fact whether Sapa's T&Cs apply to the purchase of painted lineals, as discussed above.  Accordingly, it will be left for the jury to decide if the T&Cs apply and whether Marvin properly, effectively, and timely rejected the inventory.  See Pioneer Peat, Inc. v. Quality Grassing & Servs., Inc., 653 N.W.2d 469, 473 (Minn. Ct. App. 2002) ("Absent a contract provision defining the time allowed for rejection, a reasonable time for rejection is a question of fact.").

## B.    Breach of Express Warranties

As discussed above, Marvin alleges that Sapa provided two express warranties: (1) the ten-year Performance Warranty; and (2) the Warranty of Description that the lineals met Marvin's specifications upon shipment.  Both parties agree that Sapa extended the latter warranty, and Sapa acknowledges its alleged breach is a question of fact for the jury.  But Sapa denies ever extending the former warranty.  As discussed above, the Court has concluded there is a genuine issue of material fact as to whether Sapa extended the Performance Warranty to Marvin, precluding summary judgment on this claim.

Sapa also raises a statute-of-limitation defense to Marvin's breach-of-warranty claims.  Marvin was required to commence its claims for breach of warranty within four

years of accrual.  Minn. Stat. § 336.2-725(1); 13 Pa. Cons. Stat § 2725(a).  A claim accrues when the breach of warranty occurs, and the breach is generally considered to have occurred "when tender of delivery is made."  Minn. Stat. § 336.2-725(2); <u>accord</u> 13 Pa. Cons. Stat § 2725(b).  This is true "regardless of the aggrieved party's lack of knowledge of the breach."  Minn. Stat. § 336.2-725(2); <u>accord</u> 13 Pa. Cons. Stat § 2725(b).  The parties entered into an agreement to toll the statute of limitation effective February 6, 2008.  Therefore, Marvin's claims arising from goods delivered more than four years before the agreement—that is, before February 6, 2004—would generally appear to be time-barred.  And they are, with one important caveat.

The rule for when the breach of a warranty occurs, and therefore when the cause of action accrues, is different for warranties of future performance.  Minn. Stat. § 336.2-725(2) ("[W]here a warranty explicitly extends to *future performance* of the goods . . . the cause of action accrues when the breach is or should have been discovered.") (emphasis added).  The breach of an express warranty of future performance does not occur when delivery of the goods is made, it occurs when "the plaintiff discovers or should have discovered the defendant's refusal or inability to maintain the goods." <u>Highway Sales, Inc. v. Blue Bird Corp.</u>, 559 F.3d 782, 787 (8th Cir. 2009).  Therefore, if a jury determines Sapa gave Marvin the Performance Warranty, the relevant question would be when Marvin discovered (or should have discovered) Sapa's refusal to honor it, *not* when the failed goods were delivered.  The record indicates Sapa remained willing to reimburse Marvin for the repair and replacement of failed windows and doors (if caused by Sapa) through August 2007—well beyond the 2004 cut-off.  (<u>See</u> Lindell Decl. (Doc.

No. 458) Ex. 3 at 228.)  Accordingly, if a jury determines Sapa gave Marvin the

Performance Warranty, Marvin's claims under that warranty may not be time-barred.  If

the jury determines Sapa did *not* give athePerformance Warranty, however, Marvin may

only recover for goods delivered on or after February 6, 2004.

### C.      Breach of Implied Warranties

Marvin alleges that Sapa breached the implied warranties of fitness for a particular

purpose and merchantability by selling it defective lineals.  It contends Sapa's sale of

lineals included an implied warranty of merchantability because Sapa, the seller, is a

"merchant" with respect to goods of that kind as defined by the U.C.C..  See U.C.C. §§ 2-

314 (describing implied warranty of merchantability), 2-104 (defining "merchant").

Marvin also alleges the agreement included an implied warranty of fitness for a particular

purpose because Sapa knew Marvin was relying on it to produce lineals appropriate for

incorporation into aluminum-clad windows and doors to be sold and installed nationwide.

(See U.C.C. § 2-315 (describing implied warranty of fitness for a particular purpose).)

Marvin avers Sapa breached both these implied warranties by selling it defective lineals.

First, Sapa argues it disclaimed these warranties in its T&Cs.  As discussed above,

whether the T&Cs governed the sales at issue is a question for the jury.

Second, Sapa asks the Court to determine the implied warranties, if not disclaimed

by the T&Cs, were nonetheless precluded by Marvin's provision of detailed

specifications to Sapa.  "The situation in which the buyer gives precise and complete

specifications to the seller is not explicitly covered in [the U.C.C. section regarding

disclaimer of implied warranties], but *this is a frequent circumstance by which the*

*implied warranties may be excluded.*" U.C.C. § 2-316, cmt. 9 (emphasis added).[10] In

situations "where the buyer has taken upon himself the responsibility of furnishing the

technical specifications, . . . the buyer is not relying on the seller's skill and judgment."

Air Techniques, Inc. v. Calgon Carbon Corp., No. 93-1412, 1995 WL 29018, at *10–11

(4th Cir. Jan. 26, 1995) (quotation and citation omitted). If the seller produces goods that

conform to the specifications but are nonetheless defective, presumably the buyer's

specifications are at fault, not the seller's skill or judgment. To avoid holding the seller

liable under such circumstances, many courts hold that no implied warranties arise. E.g.,

Cumberland Farms, Inc. v. Drehmann Paving & Flooring, Co., 520 N.E.2d 1321, 1325

(Mass. App. Ct. 1988) ("When goods are provided according to plans and specifications

furnished by the buyer, the seller does not impliedly warrant their fitness for a particular

purpose, and no implied warranty of merchantability arises.").

     In this case, Marvin provided Sapa detailed specifications covering the

pretreatment, coating, and testing of its lineals instead of having Sapa choose what the

best specifications would be for their use in Marvin's windows and doors. Nonetheless,

Marvin asserts it relied on Sapa's judgment because it consulted Sapa when deciding

which specifications to use. The decision to utilize the AAMA 2605 specifications, for

example, was—at least in part—a collaborative effort among Marvin, Sapa, and Valspar.

But in the end, the decision to provide specifications to Sapa (and which ones) rested

with Marvin alone. Marvin may pursue a breach of warranty for Sapa's alleged failure to

---

[10] Although neither Minnesota's nor Pennsylvania's Supreme Court has addressed this particular
issue, both states' legislatures adopted the U.C.C. and the Court believes the courts would
therefore find the U.C.C.'s approach persuasive.

meet its specifications, but its decision to provide those specifications precludes any implied warranties that might have otherwise arisen between the parties.

### D. Negligent Misrepresentation

Marvin alleges several fraud-based claims, all of which generally stem from allegations that Sapa knew something was amiss and did not communicate this to Marvin. Marvin first claims that Sapa owed it a "duty of reasonable care in obtaining and communicating accurate and complete information" and Sapa breached this duty by making various misrepresentations to Marvin about the lineals and Sapa's process for manufacturing them. (Compl. ¶ 80.) Under Minnesota law, "a breach of contract, even if done in bad faith, is not a tort." Best Buy Stores, L.P. v. Dev'rs Diversified Realty Corp., No. 05-2310, 2007 WL 4191717, at *15 (D. Minn. Nov. 21, 2007) (Doty, J.). Accordingly, Marvin may only maintain a negligent-misrepresentation claim if it is independent from its breach-of-contract claims. "A tort is independent from a breach of contract if 'a relationship would exist which would give rise to the legal duty without enforcement of the contract promise itself.'" Jones v. W. Union Fin. Servs., 513 F. Supp. 2d 1098, 1100 (D. Minn. 2007) (Doty, J.) (quoting Hanks v. Hubbard Broad., Inc., 493 N.W.2d 302, 308 (Minn. Ct. App. 1992)). This is known as Minnesota's "independent duty rule." Here, the Court concludes that Sapa owed Marvin no extra-contractual duty of care.

Under Minnesota law, the general rule is that "no duty of care exists between sophisticated equals negotiating a business transaction unless the parties have a special relationship." Children's Broad. Corp. v. Walt Disney Co., 245 F.3d 1008, 1019–20 (8th

Cir. 2001).  In the instant case, there is no "special relationship" between the parties that would give rise to a duty and there can be little question that both parties are sophisticated and experienced businesses.  Marvin alleges that Sapa owed it a duty because they were "business partners" and cites SafeCo Insurance Co. of America v. Dain Bosworth, Inc., 531 N.W.2d 867 (Minn. Ct. App. 1995), in support.  But in that case, the court *dismissed* the negligent-misrepresentation claim by one business partner against the other and stated that business partners do *not* owe one another a duty "beyond honesty."[11]  Id. at 871.  Thus, even Marvin's own authority supports the dismissal of its claim.

### E.     Fraud

Marvin alleges that Sapa knowingly made false statements that (1) Sapa's lineals were produced using Sapa's standard procedures and would meet the specifications; (2) Sapa's change in pretreatment chemical suppliers would not affect the quality, longevity, or uses of its lineals; and (3) Sapa found no fundamental issues in the audit of its pretreatment process.  Marvin further alleges that it relied on these misrepresentations in deciding to purchase (or continue to purchase) lineals from Sapa.  Sapa argues that these claims are merely breach-of-contract claims recast as fraud and should therefore be dismissed.

Both Pennsylvania and Minnesota have adopted the "economic loss doctrine." See Minn. Stat. § 604.10; Werwinski v. Ford Motor Co., 286 F.3d 661, 671 (3d Cir.

---

[11] That Sapa breached its "duty of honesty" is precisely what Marvin's *fraud* claim alleges; it is not grounds for a separate negligent-misrepresentation claim.

2002).[12]  Under this doctrine, economic losses arising from the sale of goods between merchants, such as those Marvin seeks to recover here, cannot be recovered through a tort action.  Minnesota specifically exempts a tort action based upon fraud from this doctrine, but Pennsylvania does not.  See Minn. Stat. § 604.10 ("This section shall not be interpreted to bar tort causes of action based upon fraud . . . .").  Thus, if Sapa's T&Cs apply, which mandate the application of Pennsylvania law, then Marvin's fraud claim— indeed, each of its tort claims—is barred.  See Werwinski, 286 F.3d at 671.

Sapa next argues that Marvin's fraud claim is barred because it is duplicative of the contract and warranty claims.  As previously stated, under Minnesota law, "a breach of contract, even if done in bad faith, is not a tort."  Best Buy, 2007 WL 4191717, at *5. Therefore, "if actions at the heart of a tort claim are identical to those which constitute a breach of contract, no separate tort cause of action exists."  Ransom v. VFS, Inc., Civ. No. 12-1197, 2013 WL 147268, at *14 n.6 (D. Minn. Jan. 14, 2013) (Tunheim, J.) (quotations omitted).  But "[t]he law of 'contorts' is a muddy area, devoid of bright line rules or easy answers as to what conduct constitutes a tort, and what a breach of contract."  Best Buy, 2007 WL 4191717, at *3 (quotation omitted).

The Court concludes that only the first of Sapa's alleged misrepresentations is based on conduct that would constitute a breach of contract.  The specifications in the

---

[12] Although the Pennsylvania Supreme Court has not addressed this issue, the Court relies on the Third Circuit's opinion in Werwinski, 286 F.3d at 671.  In that case, the Third Circuit predicted the Pennsylvania Supreme Court would adopt the doctrine based on the U.S. Supreme Court's adoption of it in an admiralty products-liability case and the Pennsylvania Superior Court's subsequent adoption of it.  Id. (describing the reasoning in E. River S.S. Corp. v. Transamerica Delaval, Inc., 476 U.S. 858, 871 (1986), and the decision in REM Coal Co. v. Clark Equip. Co., 563 A.2d 128, 134 (Pa. Super. Ct. 1989)).

parties' contract specifically cover the pretreatment process for and quality of Sapa's lineals. Thus, any tort claim premised on Sapa's failure to conform to those specifications is premised on a breach of contract (or rather, breach of warranty) and barred under Minnesota law. The parties' contract is *silent*, however, as to the subjects of Sapa's other alleged misrepresentations—the effects of changing chemical suppliers and the outcome of an internal audit. Therefore, if Minnesota law applies, Marvin may proceed with its fraud claim as to these alleged misrepresentations. See <u>Hanks</u>, 493 N.W.2d at 308 ("Spencer's employment contract was silent in regard to whether HBI would promote her or whether her role would be reduced in comparison to her co-anchor. Thus the representations made to Spencer [about those subjects] are not contract related, even though the original relationship arose pursuant to a contract.").

     **F.     Fraudulent Concealment**

     Marvin asserts Sapa knew its lineals were defective and fraudulently concealed this knowledge by failing to notify Marvin of the defects and by making the allegedly fraudulent misrepresentations discussed in the previous section. Marvin asserts this as an independent claim *and* as a defense that would toll the statute of limitations on its other claims.

     Fraudulent concealment will toll the statute of limitations only if a party conceals the very existence of the facts giving rise to the cause of action, such that the plaintiff was unaware the cause of action existed at all. <u>Hydra-Mac</u>, 450 N.W.2d at 918. "A party need not know the *details* of the evidence establishing the cause of action, only that the cause of action exists." <u>Id.</u> at 919 (emphasis added). In <u>Hydra-Mac</u>, the Minnesota

Supreme Court concluded the plaintiff buyer was aware of problems with the seller's engines since the beginning of the parties' relationship and therefore it "had information that it may have had a cause of action for defective engines from the inception of the [parties'] arrangement." Id.

The circumstances in Hydra-Mac are similar to those here. Even more comparable, however, are the circumstances of Marvin Lumber & Cedar Co. v. PPG Indus., Inc., 223 F.3d 873, 879 (8th Cir. 2000), in which the Eighth Circuit affirmed the denial of Marvin's fraudulent-concealment defense against its wood-preservative supplier, PPG. The court explained: "At all times, Marvin had access to each of the very facts that establish Marvin's breach of contract action, namely [the wood preservative]'s alleged failure to prevent rot on Marvin's products. . . . None of PPG's alleged acts could have covered up the relevant facts." The Court sees no reason to distinguish this case from PPG. Just as Marvin knew its wooden windows were rotting in PPG, Marvin knew its aluminum-clad windows were corroding as early as the 1990s, when customers complained. Therefore, Marvin "had access to each of the very facts that establish" its breach of warranty action. Id. This is true even though Marvin did not definitively know the cause of the corrosion. Accordingly, Marvin may not assert fraudulent concealment as a defense to the statute of limitations.

Marvin's assertion of fraudulent concealment also fails as an independent claim. "Fraud encompasses, among other things, theories of fraudulent misrepresentation, fraudulent concealment, and fraudulent inducement. In some circumstances, fraudulent misrepresentation and fraudulent concealment may be closely related." Iverson v.

Johnson Gas Appliance Co., 172 F.3d 524, 529 (8th Cir. 1999) (citation omitted).  A

fraudulent-concealment claim relies on the deliberate concealment of some material fact,

whereas a fraudulent-misrepresentation claim relies on either an affirmative statement of

material fact or a failure to disclose material facts where silence would be misleading.

See id.; Trs. of the Twin City Bricklayers Fringe Benefit Funds v. Superior

Waterproofing, Inc., 450 F.3d 324, 331 (8th Cir. 2006).  Marvin has not alleged Sapa

*deliberately concealed* any specific fact, but rather *failed to notify* Marvin of defects and

*made false statements*, described in the previous section.  This is not a fraudulent-

concealment claim, it is merely another iteration of Marvin's fraudulent-

misrepresentation claim.  See Iverson, 172 F.3d at 529 (dismissing fraudulent-

concealment claim because plaintiff "did not specifically allege that [defendant] had

concealed financial information," but concluding plaintiff *had* adequately pleaded

fraudulent-misrepresentation claim).

### G.    Consumer-Protection Claims

Marvin asserts claims under Minnesota's consumer protection statutes, Sections

325D.13 and 325F.69.  Because these statutes are aimed at protecting *consumers*,

merchants cannot assert claims under them.  See Solvay Pharm. v. Global Pharm., 298 F.

Supp. 2d 880, 886–87 (D. Minn. 2004) (Frank, J.); Tisdell v. ValAdCo, No. C-01-2084,

2002 WL 31368336, at *26–27 (Minn. Ct. App. Oct. 16, 2002).  The Eighth Circuit has

already addressed the question of whether Marvin is a merchant or consumer with respect

to these same statutes.  PPG, 223 F.3d at 887.  It noted, "in examining how consumer

protection statutes can co-exist with the U.C.C., the [Minnesota Supreme Court has

drawn] a sharp distinction between commercial parties and consumers." Id. The court ultimately concluded that "Marvin is a merchant with respect to window treatments" and noted that such a conclusion "quickly dispose[d] of Marvin's claim." Id. Marvin offers no persuasive grounds upon which to distinguish PPG from the case at hand. Accordingly, the Court concludes that Marvin is a merchant, not a consumer, and therefore its statutory claims should be dismissed.

### H.     Contribution or Indemnity

Finally, Marvin asserts a claim for contribution or indemnity, alleging Sapa is liable for the entire cost of repairing and replacing Marvin's customers' windows and doors. The doctrine of contribution requires a party who is *jointly liable* with another to contribute when the other has paid more than its "fair share" of damages to a third party. First Nat'l Bank v. Am. Lenders Facilities, Inc., No. 00-269, 2002 WL 31163123, at *4 (D. Minn. Sept. 23, 2002) (Tunheim, J.). While *Marvin* may be liable to its customers under a warranty it issued to them, it has established no theory under which *Sapa* would be liable to Marvin's customers. Thus, Marvin and Sapa are not jointly liable to a third party and Sapa has no duty of contribution.

The doctrine of indemnity provides that one who is liable to a third party may seek reimbursement or "indemnification" from another who is vicariously liable to the third party or with whom he has an express agreement for indemnification. Blomgran v. Marshall Mgmt. Servs., 483 N.W.2d 504, 506–07 (Minn. Ct. App. 1992). Here, Sapa is not vicariously liable to Marvin's customers. Thus, to establish a right to indemnification, Marvin must show that Sapa expressly agreed to indemnify it. To this

end, Marvin alleges that indemnification was included in the alleged Performance Warranty. It cites to no evidence or testimony using the term "indemnity" or "indemnification," but there are several statements in the record indicating Sapa would reimburse Marvin for the repair or replacement of damaged windows. (<u>E.g.</u>, Nolan Dep. at 31; Fox Dep. at 130–32, 228.) Because Marvin has proffered evidence suggesting the parties had an agreement Sapa would indemnify Marvin for expenses incurred as a result of defects in Sapa's products, the Court concludes there is a genuine issue of material fact as to this claim.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, the Court ordered on July 22, 2013 (see Doc. No. 474) that:

(1) Marvin's Motion for Partial Summary Judgment be:

(i) granted as to the enforceability of the T&Cs' disclaimer of warranties and limitation of remedies and damages; and

(ii) in all other respects denied; and

(2) Sapa's Motion for Partial Summary Judgment be:

(i) granted as to:

(a) breach of contract, only insofar as the parties agree Marvin's claims stemming from lineals incorporated into windows and doors is properly considered as a breach of warranty, not a breach of contract;

(b) breach of express warranties, only insofar as Marvin's claims stemming from goods delivered before February 6, 2004, are barred by the

statute of limitations if a jury determines Sapa did not give the Performance

Warranty;

     (c) breach of implied warranties;

     (d) negligent misrepresentation;

     (e) fraud, in its entirety if Pennsylvania law applies, but only insofar

as Marvin alleges Sapa misrepresented its extrusions were produced using

standard procedures and would meet specifications if Minnesota law

applies;

     (f) fraudulent concealment;

     (g) consumer-protection claims; and

     (h) contribution; and

(ii) in all other respects denied.


Date:  August 2, 2013             s/Richard H. Kyle
                                         RICHARD H. KYLE
                                         United States District Judge